Beverly ABUZZAHAB, Respondent,

v.

Faruk Said ABUZZAHAB, Appellant.

No. C7–82–1540.

Supreme Court of Minnesota.

Nov. 30, 1984.

Walter M. Baker, Edina, Mary C. Sherman, Minneapolis, for appellant.

James H. Hennessy, Dale M. Wagner, Minneapolis, for respondent.

KELLEY, Justice.

Respondent in this marital dissolution proceeding Faruk Said Abuzzahab appeals from the order of the district court denying his motion for a new trial, claiming that the court failed to properly consider a liability in reaching a distribution of marital property and that it abused its discretion in awarding permanent spousal maintenance in the amount of $4,000 per month to the petitioner Beverly Abuzzahab. We affirm the property distribution and reverse and remand the question of spousal maintenance.

The parties were married on June 29, 1962 in Washington D.C. and shortly thereafter moved to Minnesota to enable the respondent to obtain a post-graduate degree in pharmacology. Respondent is a board-certified psychiatrist who is presently engaged in the full-time practice of psychiatry and pharmacology. Four children were born during the marriage, three of whom remain unemancipated. In addition, the parties adopted the child of the respondent's deceased sister; that daughter is no longer a minor.

A stipulation executed by the parties provided for joint legal custody of the minor children, the physical custody of each of the minor children, liberal visitation rights and a valuation of several of the major marital assets. That stipulation was approved by the court and the substantial marital estate was essentially equally divided. The court awarded Beverly $4,000 per month as permanent spousal maintenance and $400 per month per child as child support for the two children in her physical custody.

1. The respondent first contends that the trial court abused its discretion in failing to recognize and credit to him as against the marital estate, a liability of $80,600, a prepayment for services to be performed by Psychopharmacology Fund, a research concern owned and operated by him. In our view, the fact that payment has been received but the work not yet performed does not require that the valuation of services be included as a liability against the marital estate. As a result, the property distribution, as challenged, shall stand.

2. The primary issue on appeal is whether the trial court abused its discretion in awarding $4,000 per month as permanent spousal maintenance to Beverly.

Minn.Stat. § 518.552, subd. 1 (1982) authorizes a trial court to award spousal maintenance if it finds that two criteria are satisfied, i.e., that the spouse:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education, and

(b) Is unable to adequately support himself after considering all relevant circumstances through appropriate employment or is the custodian of a child whose condition or circumstances make it appro-

priate that the custodian not be required to seek employment outside the home. Minn.Stat. § 518.552, subd. 1 (1982). Subdivision 2 of that section sets forth the factors to be considered by the trial court in determining the amount and duration of an award. Minn.Stat. § 518.552, subd. 2 (1982).

The record demonstrates that Beverly is a registered nurse, although she has not been so employed since the parties' marriage. At the time of trial, she was enrolled in a course in real estate sales, intending to obtain her real estate license. She presently is employed by Merrill Lynch Realty as a sales person. Although she suffers from chondromalacia, an inflammation beneath the kneecap, her treating physician did not suggest that the condition would affect her employment. The trial court found that she has a maximum earning capacity of $18,000 to $22,000 per year. As a result, she is capable of attaining a degree of self-sufficiency through employment. Minn.Stat. § 518.552, subd. 1(b) (1982).

Moreover, under the distribution of marital property, the petitioner has sufficient property to provide for her reasonable needs, including the cash proceeds representing her share of the homestead equity and the cash payments due her as a result of the property settlement. Minn.Stat. § 518.552, subd. 1(a) (1982).

Under those circumstances, we conclude that a permanent award is not justified under either statutory or precedential authority and remand the matter to the trial court for further proceedings to establish the durational limitation of the award. *See Otis v. Otis*, 299 N.W.2d 114 (Minn. 1980). In so doing, we affirm the amount of the award, but direct the trial court to reexamine the criteria contained in section 518.552, subd. 2 (1982) for the purpose of its determination of the appropriate period for an award of temporary maintenance.

As we point out in *McClelland v. McClelland*, 359 N.W.2d 7 (Minn., filed November 30, 1984), filed herewith, the old-

er dependent spouse who has a "traditional marriage" presents a special situation. The dissent in this case likewise stresses that the 1982 amendments to Minn.Stat. § 518.552 reflect this concern. If on remand the trial court determines from the record that it cannot clearly predict the success of the rehabilitation plan, it can, as suggested in *McClelland*, retain continuing jurisdiction to revise, if necessary, the amount and duration of the maintenance.

Affirmed in part; reversed in part and remanded for further proceedings consistent with this decision.

SIMONETT, Justice (concurring specially).

As part of her property award, the wife receives $300,863.50 in cash, $200,000 of which represents her half equity share in the homestead, for which the husband has mortgaged the homestead to pay her share. The wife apparently intends to purchase a $160,000 house with a downpayment of $100,000. The real estate she receives, which has a negative cash flow, offers a substantial tax shelter. The property distribution and its income and tax consequences are complex and varied. Suffice it to say here that I join in affirmance of the property awards. Interestingly, the trial court says it "took cognizance" of the manner in which the husband attempted to put marital property out of the wife's reach in arriving at its property distribution.

I mention the property award because it has a bearing on spousal maintenance. My concern is not with the permanency of the maintenance—as I think that might be justified in this case, unlike in *McClelland* (also decided today)—but whether, in view of the property settlement, the maintenance is too much. But I concur with the majority opinion on the assumption that the trial court, on remand, will "retain continuing jurisdiction to revise, if necessary, the amount and duration of the maintenance."

WAHL, Justice (dissenting).

I respectfully dissent. The majority opinion perpetuates this court's misreading

of the intent of the legislature in enacting Minn.Stat. § 518.552, 1978 Minn. Laws, ch. 772, § 51, and the court's subsequent misinterpretation of that statute in *Otis v. Otis*, 299 N.W.2d 114 (Minn.1980). We must review *Otis* in the light of the legislature's response to our decision in that case, which we have not, until now, had the opportunity to do.

Section 518.552 is concerned with the granting of maintenance in marriage dissolution proceedings under Chapter 518. Formerly, alimony[1] was the provision made for a needy wife from the future income or earnings of the husband. The court could determine in any judgment of divorce, as one of the issues of the case, whether or not the wife was entitled to an award of alimony, even though such an award was not then made. Minn.Stat. § 518.55 (1982). The statute did not specify whether alimony should be awarded on a permanent basis, a temporary basis, or either of the two depending on the facts and circumstances of the case. Under this statute, in the exercise of their sound discretion, courts of this state awarded alimony both permanently, *Cashman v. Cashman*, 256 N.W.2d 640 (Minn.1977); *Arundel v. Arundel*, 281 N.W.2d 663 (Minn.1979), and for lesser periods of time, *Ruzic v. Ruzic*, 281 N.W.2d 502 (Minn.1979) (6 years) but not as a matter of right, *Cooper v. Cooper*, 298 Minn. 247, 251, 214 N.W.2d 682, 685 (1974).

An award of permanent alimony was considered a substitute for a husband's duty to support a wife to the extent that her earning capacity was permanently impaired due to the fact that "she was married at a time when the prevailing social custom made her professional career subordinate to her husband's and required that she abandon a career to raise her son and keep house for her husband." *Otis*, 299 N.W.2d at 118 (Otis, J., dissenting). Factors considered important in the award of permanent alimony were length of the mar-

riage, the wife's age, health, earning capacity, lack of vocational skills or independent resources, contribution to marriage by child-rearing and maintenance of family home in such a way as to contribute to establishment and furtherance of the husband's career, and resources and income of the husband. *Loth v. Loth*, 227 Minn. 387, 35 N.W.2d 542 (1949); *Arundel v. Arundel*, 281 N.W.2d at 666. A divorced wife, where alimony was appropriate, was entitled, not just to the bare necessities of life, but to a sum which would enable her to maintain her standard of living at the time of the divorce to the extent the husband was reasonably able to provide it. *Arundel, id.; Cooper*, 298 Minn. at 251–52, 214 N.W.2d at 686; *Botkin v. Botkin*, 247 Minn. 25, 77 N.W.2d 172, 175 (1956).

In 1978, as the *Otis* court recognized, the legislature significantly amended the law of divorce. 1978 Minn. Laws, ch. 772. "Alimony" was still allowed but had now become "maintenance" which could be awarded from the future income or earnings of either spouse for the support and maintenance of the other. Minn.Stat. § 518.54, subd. 3 (1978). To have granted maintenance, a court must have found that the spouse seeking maintenance a) lacked sufficient property, including apportioned marital property, to provide for the spouse's reasonable needs, "especially during a period of training or education," and b) was unable to be adequately self-supporting "after considering all relevant circumstances through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home." Minn.Stat. § 518.552, subd. 1 (1978). Again, the statute did not specify whether such support and maintenance should be awarded on a permanent basis, a temporary basis, or either of the two depending on the facts and circumstances of the case, but provided that the maintenance order should be in amounts and for "periods of time" as the

---

**1.** "Alimony" was defined by Minn.Stat. § 518.54, subd. 3 (1968), as "an award made in a divorce proceeding of payments from the future income or earnings of the husband for the support and maintenance of the wife only."

court deems just, without regard to marital misconduct and after considering all relevant factors. Minn.Stat. § 518.552, subd. 2 (1978). These factors include for the most part the factors previously considered relevant by our cases in the award of alimony. Minn.Stat. § 518.552, subd. 2(a)–(g)(1978).

The court in *Otis* seemed to read the word "especially" out of the requirement that the spouse seeking maintenance lack "sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education," seemed to read "for periods of time" to be something less than permanent, and, citing Florida Court of Appeals cases for the proposition, seemed to conclude that the legislature intended maintenance to be for rehabilitative purposes only. It is true that rehabilitative maintenance is all that many women need, if they need it at all, particularly those women growing up in the 1960s and 1970s with careers and job skills and every expectation of sharing equally in the parenting, household work and finances of marriage. Midlife women, however, those women between the ages of 45 and 65, entered marriage under a very different set of rules. Like Georgia Contos Otis and Beverly Abuzzahab, they abandoned their own jobs and careers to fulfill the expected, traditional roles of mother, wife and hostess for rising business and professional men. In those years in which they would have developed job skills and careers, gained seniority and built up Social Security accounts, they worked at home. Their husbands, like Emmanuel Otis, often forbade these women to seek outside employment because they were "not going to have any wife of mine pound a typewriter." *Otis*, 299 N.W.2d at 118.

There is no indication in section 518.552 that the Minnesota legislature intended the courts to turn this group of women out to

lives of poverty in their later years.[2] It is absolutely clear in the legislature's response to *Otis v. Otis* that the legislature did *not* so intend. *Otis* was released October 3, 1980. The 1982 session of the Minnesota legislature adopted, as Chapter 535–S.F. No. 378, the following "act relating to marriage dissolution; *clarifying* factors to consider in awarding maintenance; amending Minnesota Statutes 1980, Section 518.-552" (emphasis added).

### BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA:

Section 1. Minnesota Statutes 1980, Section 518.552, is amended to read:

518.552 **MAINTENANCE.**

Subdivision 1. In a proceeding for dissolution of marriage or legal separation, or in a proceeding for maintenance following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse and which has since acquired jurisdiction, the court may grant a maintenance order for either spouse if it finds that the spouse seeking maintenance:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education, and

(b) Is unable to adequately support himself after considering all relevant circumstances through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

Subd. 2. The maintenance order shall be in amounts and for periods of time, either temporary or permanent, as the court deems just, without regard to mari-

---

**2.** The United States Census Bureau, in Current Population Reports, Money Income of Households, Families and Persons in the United States, 1981, gives the following:

INCOME (Median) by Age and Sex, 1981

| Age | Men | Women |
|---|---|---|
| 45–49 | $21,248 | $7,494 |
| 50–54 | 20,796 | 6,513 |
| 55–59 | 19,879 | 5,926 |
| 60–64 | 14,807 | 4,966 |
| 65+ | 8,173 | 4,757 |

tal misconduct, and after considering all relevant factors including:

(a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, and the probability, given the spouse's age and skills, of completing education or training and becoming fully self-supporting;

(c) The standard of living established during the marriage;

(d) The duration of the marriage and, in the case of a homemaker, the length of absence from employment and the extent to which any education, skills, or experience have become outmoded and earning capacity has become permanently diminished;

(e) The age, and the physical and emotional condition of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(g) The contribution of each party in the acquisition, preservation, depreciation, or appreciation in the amount or value of the marital property, as well as the contribution of a spouse as a homemaker.

Sec. 2.  **EFFECTIVE DATE.**

Section 1 is effective May 1, 1982.

Approved March 22, 1982

**Changes or additions are indicated by underline, deletions by strikeout.**

The legislative history of the 1982 amendment leaves no doubt as to the legislative intent. Senator Berglin, who had introduced the original section 518.552 legislation, spoke on behalf of her bill in the Subcommittee on Law Revision, Senate Judiciary Committee, as follows:

Basically, this bill is brought to you because of some of the language in the ruling in *Otis v. Otis* which was recently, or last fall I believe, was ruled on, October 3rd, 1980, in which the Minnesota Supreme Court in a rather split decision chose to interpret the law that we passed on marriage dissolution and the awarding of maintenance to place heavy emphasis on the rehabilitative aspects of the bill.

It was, of course, not the intention of the legislature to place emphasis on that aspect to the exclusion of permanent maintenance and the need for some homemakers, particularly homemakers of a longtime marriage, to be able to receive permanent maintenance.

I think that it is clear that very oftentimes, if a person has been out of the work force for a very long period of time and is re-entering the work force late in life, that there is clearly permanent damage done to their ability to be able to participate in the work place in a competing manner, and certainly the economic capacity of that person's earning power has been diminished.

What we are doing then in the bill is including language to make it clear to courts in the future in Minnesota that we mean both temporary and permanent maintenance.

Subcommittee on Law Revision, Senate Judiciary Committee, Tuesday, April 7, 1981, S.F. 378.

The following is the "clarifying" language adopted by the legislature:

Subd. 2.  The maintenance order shall be in amounts and for periods of time, *either temporary or permanent*, as the court deems just, * * *

\*    \*    \*    \*    \*    \*

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, *and the probability, given the spouse's age and skills, of*

*completing education or training and becoming fully self-supporting;*

\* \* \* \* \* \*

(d) The duration of the marriage *and, in the case of a homemaker, the length of absence from employment and the extent to which any education, skills, or experience have become outmoded and earning capacity has become permanently diminished;*

This language makes clear that to the extent this court held in *Otis* that section 518.552 emphasizes rehabilitative maintenance to the exclusion of permanent maintenance, it is not good law and should not be followed. The legislature intended permanent maintenance to be, not a "lifetime pension" in every case, but an option in those cases where the earning capacity of a long-term homemaker has become permanently diminished during the course of the marriage.

The primary issue in the case before us, as articulated in the majority opinion, is whether the trial court abused its discretion in awarding $4,000 per month as permanent spousal maintenance to Beverly Abuzzahab. The majority proposes to affirm the amount of the award for some period of time but concludes that the trial court's award of permanent maintenance is not justified. I cannot agree. The standard of review on appeal from a trial court's determination of a maintenance award is whether the trial court abused the wide discretion accorded it. Absent abuse, the determination is final. *Erlandson v. Erlandson,* 318 N.W.2d 36, 38 (Minn.1982).

Beverly Abuzzahab was a psychiatric nurse over 20 years ago when she gave up that career upon her marriage to Dr. Faruk Abuzzahab to become a full-time homemaker and mother. The couple first adopted Dr. Abuzzahab's niece, then had four children of their own. Beverly Abuzzahab is 49 years old; today her professional skills are outmoded; and she suffers from chondromalasia, an inflammation beneath the kneecap which appears to require surgery on at least one knee. It is questionable whether with this condition she could perform nursing services even if there were a demand for her particular skills and those skills were rehabilitated. She is trying to sell real estate but at the time of trial had yet to realize her first commission from this source. She was awarded physical custody of the daughter and the youngest son, age 8, and will be obliged to use a substantial part of the property awarded to her, some of it not income-producing and not easily saleable, to provide a new home, while Dr. Abuzzahab will stay in the $400,000 family home, which is paid for, with the two older sons.

The trial court was very concerned that the children in the mother's custody have the same advantages as the children in the father's custody, or at least not have their standard of living dramatically reduced, and took into consideration, in setting this award of maintenance, the minimal child support ordered. Dr. Abuzzahab's income from his professional corporation was $215,473 in the fiscal year ending July 31, 1981.[3] Beverly Abuzzahab was found by the court to have a maximum earning capability of $18,000 to $22,000 per year. The trial court considered the state of Beverly Abuzzahab's health; her age; her contribution as a homemaker for 20 years; the standard of living maintained during the marriage; her monthly living expenses, including income taxes payable on maintenance; her nonuse of her nursing skills and absence of career advancement for 20 years; and Faruk Abuzzahab's ability to pay maintenance from his current income level. The trial court found that Beverly Abuzzahab lacked sufficient property, including marital property apportioned to her, to provide her reasonable needs and that she was unable to adequately support herself under the relevant circumstances. The trial court then awarded permanent maintenance, recognizing that the amount

3. The trial court also found that Dr. Abuzzahab attempted to place all of the non-joint-tenancy marital assets beyond the reach of his wife by attempting to set up a wholly revocable inter vivos trust for the benefit of his children while retaining total control of said assets.

would be subject to reduction when Beverly Abuzzahab returned to the work force full-time. This determination is within the broad discretion of the trial court and should be affirmed.

COYNE, Justice (dissenting).

I join in the dissent of Justice Wahl.