In re the Marriage of Arden H. **GRIEPP, Petitioner,**
**Respondent,**

v.

**Janet E. GRIEPP, Appellant.**

**No. C6–85–961.**

Court of Appeals of Minnesota.

Feb. 18, 1986.

in the trial court's distribution of marital property and in its award of rehabilitative maintenance. Post-trial motions to amend the judgment and decree or, alternately, to grant a new trial were denied. We affirm.

## FACTS

Arden and Janet Griepp were married on March 14, 1959, separated on August 8, 1982, and divorced on February 25, 1985. The marriage produced three children, all emancipated at the time of the dissolution trial. For two and one-half years prior to and during the marriage, appellant was employed in various clerical positions. In 1959, she left her position as a steno clerk, pending the birth of the couple's first child. She ceased working outside the home after this period of time. Respondent and his brother are co-owners of Griepp Brothers Blacktopping, Inc., of which respondent is president, and a partnership, Griepp Brothers Partnership. Appellant worked part time for the companies doing clerical work and filing. The position was not paid.

During the marriage the parties lived in a three bedroom rambler with a heated double garage in Bloomington. The homestead included a large fenced-in yard, bordered on one side by a major interstate freeway. While the dissolution action was pending, both parties engaged separate appraisers for valuation of the homestead. Because of the wide discrepancy in the figures, the parties agreed to retain a third appraiser.

Diana Smith Logan, Minneapolis, for respondent.

James C. Lofstrom, Alton, Severson, Sovis, Groves & Chezick, P.A., Apple Valley, for appellant.

Heard, considered and decided by FOLEY, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

FOLEY, Judge.

Janet H. Griepp appeals from a February 25, 1985 dissolution decree, claiming error

The proposal was made by appellant's former attorney, Judy Mack, in a letter dated April 13, 1984. The letter provided in pertinent part:

I discussed the issues of the valuation of the homestead and the personal property with Ms. Griepp. It is our proposal that the parties hire a professional appraiser to appraise both the property and its contents. Ms. Griepp would prefer that the parties agree that they would be bound by the appraisals. She also proposes that the parties share equally the cost of the appraisal. * * *

Choosing the appraiser should be done by both parties and a neutral person—unknown to either of them—should be chosen. This way, they can both feel less constraints in agreeing to be bound by the appraisals.

In a letter dated May 24, 1984, respondent's present attorney stated:

This letter is to confirm our phone conversation. It is my understanding that I will obtain a third appraisal on the house and that we both will be bound by the third appraisal; * * * and that you will obtain a copy of the appraisal of Mr. Griepp's business and forward a copy to me.

The attorneys agreed upon appraiser George Johnson, whom both attorneys had used on a previous occasion.

Johnson appraised the Griepp homestead at $92,000. At the November 7–8 trial, he explained that his appraisal was based on a comparison method of valuation, a more accurate measure of residential property. The comparison point were three homes sold within two months of the appraisal and within two miles of the couple's home. The comparable homes had been sold for $86,250, $88,900, and $95,000. Johnson then evaluated the different features of the homestead and the comparable properties. With the net adjustments, the comparable properties were valued at $94,250, $91,900, and $92,000, respectively. His appraisal report indicated that the Griepp home had a lot and garage superior to all three comparable properties, but that its overall condition was inferior because it needed some decoration and painting.

William Ward, an appraiser retained by appellant after she received Johnson's report, also used a three-home comparison method of valuation. In Ward's opinion, the subject property had an estimated market value of $78,000. The comparable homes sold for $85,000, $82,900 and $81,000. The first comparable was located on the same block as the subject home, and the other two properties were approximately one mile east, close to a commercial area. In Ward's opinion, the single most important factor in appraising the subject property was its close proximity to Interstate 35W. He stated that the comparables were in superior condition and that a commercial office complex, apartments and condominiums within two blocks of the homestead diminished its value.

Respondent testified that in the past three years he has averaged a net monthly income of $3,160 during the seven months of the year in which blacktop may be laid. The trial court averaged this amount over 12 months to $1,843 per month. Although respondent's 1984 *gross* business income was likely to approximate $51,000, he indicated that his *net* income was unlikely to change due to increased operating expenses. Respondent submitted a monthly budget of $1,807, including $472 in recreational expenses. The trial court discounted the recreational expense as an unreasonable living expense.

Appellant testified that her monthly living expenses were $1,170. She stated that for a short time after the couple's separation in August of 1982, respondent paid the household expenses and provided her with an additional $200 per month. Subsequent to that time, she began paying for utilities and received an additional $400 per month from respondent, which was increased to $500 per month during the winter months.

It was uncontested that appellant earned $231 per month as rental income from a home in which she had inherited a 50% interest. Additionally, she usually received $100–150 per month for groceries from her son, who resided with her.

At trial, two rehabilitative counselors testified as to appellant's ability to become self-sufficient. Based on her interview of appellant, expert Lynn Arbogast concluded that appellant was "semi-skilled" and could immediately re-enter the job market earning $600-700 per month as a clerical worker. Arbogast noted that 1–2 years of vocational training would enhance appellant's employability.

Expert Lois Hennen concurred with most of Arbogast's conclusions. However, she disagreed with Arbogast's assessment that appellant was presently "semi-skilled,"

finding instead that such a classification was more accurate of appellant's skills at age 24. Hennen estimated that appellant's earning capacity was limited to an hourly wage of $7 because she did not have a college degree. She concluded that appellant could re-enter the job market at an entry-level position after six months to two years of retraining.

Both experts testified that appellant lacked motivation to re-enter the job market but that could be overcome through retraining. The trial court adopted this opinion in its findings.

The trial court concluded that despite a possible ambiguity in the parties' agreement, the parties were bound by the $92,000 appraisal. Notwithstanding this finding, the trial court concluded that independent evidence supported the $92,000 appraisal. The trial court denied appellant's request for permanent maintenance and found no evidence to support appellant's claim that respondent dissipated the tax refunds for his own purposes.

## ISSUES

1. Did the trial court err when it determined that the parties were bound by a third appraisal of the homestead at $92,000 and when it determined that independent evidence supported the appraisal, notwithstanding the parties' agreement?

2. Did the trial court err when it failed to determine that state and federal tax refunds were dissipated?

3. Did the trial court err when it awarded appellant rehabilitative maintenance in the amount of $800 per month for the first year of a four-year period at decreasing amounts and when it refused to award permanent maintenance?

## ANALYSIS

We note from the outset that appellant's motion for a new trial was denied because it did not set forth specific grounds upon which a new trial was sought. *See* Minn.R. Civ.P. 59.01; *Swartwoudt v. Swartwoudt,* 349 N.W.2d 600 (Minn.Ct.App.1984). Accordingly, we need not review this particular claim.

1. *Appraisal of Homestead.*

Appellant contends that the trial court erred in finding that the parties were bound by the $92,000 appraisal. She claims that the binding effect of the agreement was dependent on two conditions, neither of which was met. First, that the appraiser was "unknown" to all parties involved, including the attorneys, and second, that respondent have no contact with the appraiser.

It is conceivable that "a neutral person—unknown to either of them" included a person unknown to the attorneys since they actually selected the appraiser. Nonetheless, we think the third appraisal is binding on the parties. Appellant presented no evidence to substantiate her claim of undue influence by respondent. Furthermore, the attorneys from both sides had utilized Johnson's services on only one prior occasion. In short, there is nothing in the record to suggest that the parties received anything but an independent and neutral appraisal, the benefit of their bargain.

Even if we agreed with appellant, we would not similarly find clear error. Exactitude is not required by a trial court when valuing assets. It is only necessary that the value arrived at lies within a reasonable range of figures. *Johnson v. Johnson,* 277 N.W.2d 208 (Minn.1979). The trial court's valuation of the homestead at $92,000 is amply supported by the record.

The trial court was presented with appraisals by Johnson and by Ward. Both experts utilized a three-home comparison method of valuation measuring such factors as location of the home, size and condition of the home and yard, number of rooms and bathrooms, and necessary improvements. In its findings, the trial court stated:

Based on the size and condition of the parties' home, its location in a residential neighborhood, and the large, scenic lot on which the house is situated, and after a thorough consideration of both valuation reports and the comparable sales

upon which the valuations are premised, this court concludes that current fair market value of the parties' homestead is $92,000.

In *Ferguson v. Ferguson,* 357 N.W.2d 104, 107 (Minn.Ct.App.1984), this court stated:

Where conflicting opinions of expert witnesses have a reasonable basis in fact, the trier of fact must decide who is right, and the decision will not be overturned on appeal.

## 2. *Tax Refunds.*

Appellant claims the record supports that respondent dissipated $8,474 in tax refunds since his total monthly expenses, including monies paid for her support and for ski trips with the couple's children, exceeded his monthly income. In essence, appellant argues that respondent's control over the assets during the separation period and his use thereof constitutes dissipation. This claim is contrary to the law. Rather:

A party to a marriage subject to severance in divorce proceedings cannot be permitted to subvert the orderly processes of the courts by concealing, dissipating, or misusing his assets in anticipation of divorce so as to reduce the property available for division * * *.

*Bollenbach v. Bollenbach,* 285 Minn. 418, 428, 175 N.W.2d 148, 155 (1970). However, as the trial court properly noted, "the court may disregard *depletions* of marital assets prior to trial, in making its property division", *Nolan v. Nolan,* 354 N.W.2d 509, 513 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. December 20, 1984):

[T]he payment of these living expenses of the parties with the tax refund does not constitute dissipation of a marital asset. * * * Since there is no basis in the record to conclude that the tax refunds were dissipated, the Court is unable to distribute or apportion the funds as a marital asset.

■ Furthermore, here neither the parties' tax returns for the period at issue nor check stubs were presented at trial. Thus, the precise amount appellant claims to be dissipated is not clearly demonstrated. The trial court properly determined that

the record was insufficient to establish dissipation.

## 3. *Spousal Maintenance.*

This court's scope of review of a maintenance award is well established.

The standard of review on appeal from a trial court's determination of a maintenance award is whether the trial court abused the wide discretion accorded to it. In the absence of a finding by this court of such abuse, the trial court's determination is final.

*Erlandson v. Erlandson,* 318 N.W.2d 36, 38 (Minn.1982). Appellant contends that the trial court abused its discretion when it denied permanent maintenance and awarded rehabilitative maintenance at $800 per month for the first year out of a four-year period, rather than $1,000.

■ Pursuant to the statutory factors outlined in Minn.Stat. § 518.552 (1984), the trial court must balance the financial needs of the spouse seeking maintenance and his or her ability to meet those needs against the financial condition of the spouse providing the maintenance. Particular attention is given to periods of training or education. *Krick v. Krick,* 349 N.W.2d 350, 352 (Minn. Ct.App.1984), citing *Erlandson v. Erlandson,* 318 N.W.2d 36 (Minn.1982).

The trial court awarded spousal maintenance as follows:

[T]he sum of $800 per month commencing March 1, 1985, through February of 1986. Commencing March 1, 1986, spousal maintenance shall reduce to $700 per month and continue at this level through February of 1987. On March 1, 1987, spousal maintenance shall reduce to $500 per month and remain at this level through February of 1989.

In its detailed findings and accompanying memorandum, the trial court implicitly balanced the statutory factors in section 518.552. In Finding XI, it established that respondent's net monthly income over a 12-month period was $1,843 and that his monthly expenses were $1,335 (claimed amount less recreational expenses). The court found that this income amount had

remained fairly constant over a three-year period prior to the dissolution.

Appellant disputes this finding, claiming that respondent's own projections indicate 1984 income will be comparable to 1979 income, or $51,000. This 1984 projection is *gross* business income. Respondent clearly testified that operating expenses had increased since 1979 due to repair and replacement cost of blacktopping equipment and cost of materials. The dispositive factor here is not an increase in gross business income but rather the amount of disposable income respondent has based on his draw from the business. The record supports that this salary draw remained fairly constant from 1981 to 1983. The trial court's finding was not clearly erroneous. *See* Minn.R.Civ.P. 52.01.

Recent Minnesota decisions have limited awards of permanent maintenance to exceptional cases where there is little likelihood of a spouse attaining self-sufficiency. *McClelland v. McClelland*, 359 N.W.2d 7 (Minn.1984); *Abuzzahab v. Abuzzahab*, 359 N.W.2d 12 (Minn.1984).[1] Mindful of these cases, the trial court stated:

> In the instant case, based upon this court's finding that [appellant] is capable of full-time employment, and in light of the property distribution herein, an award of permanent spousal maintenance is inappropriate.

Appellant contends that the present case is similar to *Swanstrom v. Swanstrom*, 359 N.W.2d 634 (Minn.Ct.App.1984). In *Swanstrom*, the trial court awarded the wife $800 per month in permanent maintenance. This court affirmed, distinguishing the case from *Abuzzahab* and *McClelland* where the capacity for attaining a degree of self-sufficiency was clearly demonstrated. *Swanstrom* is distinguishable from the present case. In that case, the wife had no vocational skills or independent resources. She had attempted to pursue an accounting major but could not pass the

required tests. Further, she had health problems that could affect her ability to work and had two minor children left at home. The trial court also took judicial notice of the fact that the parties lived in Duluth, an economically depressed area.

Here, the couple's three children were all emancipated at the time of the trial. More importantly, however, both rehabilitative counsellors who interviewed appellant testified at trial that she had vocational skills which would enable her to gain an entry-level clerical job. Both experts recommended a training period of up to two years so that appellant could enhance her employment opportunities. The record is void of any evidence disputing appellant's ability to re-enter the job market and eventually attain self-sufficiency.

■ The trial court's award of rehabilitative maintenance over a four-year period incorporates careful consideration of appellant's apparent ability to re-enter the job market:

> Although [appellant] is receiving marital property valued at $102,725 as her share of the property distribution, only $9,725 of the distribution is in cash or a promissory note which is available to help [appellant] meet her needs at the present time * * *. Based upon the evidence presented at trial, it is apparent that [appellant] requires spousal maintenance during this time period of retraining and making the transition to full-time employment but that she is capable of becoming fully self-supporting.

While the trial court might have reserved jurisdiction over the permanent maintenance issue as illustrated in *Abuzzahab* and *McClelland*, we take particular note that the trial court retains jurisdiction over temporary maintenance until the obligation ceases and may within this time, upon appellant's motion, modify the award if re-

---

1. While not applicable to this case, we note that the 1985 amendments to Minn.Stat. § 518.552 modify *McClelland v. McClelland*, 359 N.W.2d 7 (Minn.1984), and *Abuzzahab v. Abuzzahab*, 359 N.W.2d 12 (Minn.1984), by providing that "[n]othing in this section shall be construed to favor a temporary award of maintenance over a permanent award, where the factors under subdivision 2 justify a permanent award." 1985 Minn.Laws, ch. 266 § 2 (amending Minn.Stat. § 518.552).

training is unsuccessful. *See Wibbens v. Wibbens,* 379 N.W.2d 225 (Minn.Ct.App. 1985). Its reasons for denying permanent maintenance were fully explained in the original judgment and reiterated with careful detail in its denial of post-trial motions. Appellant was afforded a full and fair hearing on her request for permanent maintenance.

## DECISION

The trial court did not err when it determined that the parties' agreement for an independent appraisal was fulfilled, that independent evidence supported valuation of the homestead at $92,000 and that insufficient evidence existed to support tax refunds were dissipated. The trial court properly determined that rehabilitative maintenance at the levels prescribed, and not permanent maintenance, was indicated when undisputed expert testimony established that appellant could re-enter the job market and attain self-sufficiency after a period of retraining.

Affirmed.